FILED
06/16/2021
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 15, 2020

**STATE OF TENNESSEE v. JAVARIS WILSON**

**Appeal from the Criminal Court for Davidson County**
**No. 2018-C-1740    Steve R. Dozier, Judge**

**_____**

**No. M2019-01317-CCA-R3-CD**

**_____**

The Defendant, Javaris Wilson, was convicted by a Davidson County Criminal Court jury of first degree premeditated murder and second degree murder under alternate theories of guilt for the same killing. The second degree murder conviction was merged into the first degree murder conviction, for which the Defendant received a life sentence. The sole issue the Defendant raises on appeal is whether the evidence was sufficient to establish his identity as the perpetrator. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J. joined. THOMAS T. WOODALL, J., not participating.

Jay Umerley, Nashville, Tennessee (on appeal) and Andrew Davidson, Nashville, Tennessee (at trial), for the appellant, Javaris D. Wilson.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Glenn. R. Funk, District Attorney General; and Jenny Charles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On September 4, 2016, sixty-seven-year-old Samuel Huff was shot and killed as he walked near a public housing apartment complex in Nashville. The Defendant was identified as the perpetrator by a fifteen-year-old girl who witnessed the shooting. Two other individuals identified the Defendant as the man they had seen talking with the victim

shortly before the shooting, and one of those two also identified him as the man he had seen running from the scene with a gun immediately after the shooting. In addition, a police detective familiar with the Defendant identified him on the housing complex's motion-activated surveillance camera footage, which showed a man following the victim and bending down to pick up something from the victim's body after the victim was on the ground. The Defendant was subsequently indicted for first degree premeditated murder, first degree felony murder, and attempted robbery.

The State's first witness at the Defendant's March 4-5, 2019 trial was eighteen-year-old Destiny Beasley, who testified she was fifteen years old on September 4, 2016, and knew the Defendant by his nickname, "World." At approximately 5:30 p.m. that afternoon, she was walking with some friends in the area of the Cheatham Place Apartments when the Defendant walked past her. Someone called her name, and she turned around and saw the Defendant "shoot the old man in his back." She said she saw the victim fall and the Defendant "grab a gun and run back up the street."

Ms. Beasley testified that she spoke with a detective at her school on September 7, 2016, and looked at a photographic array containing the Defendant's photograph. She stated that she at first told the detective that she did not see the Defendant because she was afraid of getting involved. The detective asked her to look at the photographs again, and the second time she identified the Defendant by saying the number associated with his photograph aloud. She did not circle his photograph or sign the array because she did not want to put anything in writing. She was certain that the Defendant was the man she saw shoot the victim, and she made a positive courtroom identification of him as the shooter.

On cross-examination, Ms. Beasley acknowledged that she did not know the Defendant's real name and knew him only casually from seeing him once or twice each week in the neighborhood. She reiterated that she saw the Defendant shoot the victim in the back and then stoop down to pick up a gun from the victim before running from the scene.

Keavan Morton, who was living out of his car in the area of the Cheatham Place Apartments at the time of the victim's death, testified that he saw the Defendant, whom he knew only by his nickname, "World," talking with the victim on the afternoon of September 4, 2016. He next heard a gunshot and then saw the Defendant running with a gun. He acknowledged that he had been drinking at the time but said he was certain it was the Defendant he saw. He identified the photographic array he had been shown by the police, from which he had identified the Defendant. He also made a somewhat tentative courtroom identification of the Defendant, explaining that he did not have his eyeglasses with him because he had broken them.

On cross-examination, Mr. Morton acknowledged he knew the Defendant only casually and had not known his real name. He conceded that he had been drinking for a while on the day of the shooting and that he did not witness the shooting. He stated that he had been wearing his eyeglasses that day.

Detective Stanley Truitt of the Nashville Metropolitan Police Department testified that he responded to the scene at approximately 7:00 p.m. on September 4, 2016. Based on the 911 call and his review of security camera footage, he determined that the victim had been shot at approximately 5:55 p.m. He identified various photographs of the crime scene as well as the video footage that had been captured by the housing project's surveillance cameras. He explained that the cameras were motion-activated, which caused the videos to have "breaks or skips" in the recorded action. He identified a man who was first recorded walking in an alley and then later running up behind the victim and, after a "skip" in the video, bending down to pick up something near the victim's body. Detective Truitt also identified enlarged photographs of the suspect's clothing and jewelry, testifying that the man, later identified as the Defendant, was wearing a necklace and a watch and was dressed in black shoes with white soles and a "Jordan" emblem, black socks with a Nike emblem, a black t-shirt with a white emblem on the front, and long shorts. He said he shared the security footage with Detectives Gary Shannon and Andrew Davis. Two days later, Detective Davis provided him with some photographs of the Defendant that he had pulled off the Defendant's Facebook page, which showed that the Defendant was similar in physical build and was dressed in the same clothing as the suspect.

Detective Truitt testified that he met with Ms. Beasley at her school on September 7, 2016, where she identified the Defendant from a photographic lineup by saying aloud the number assigned to his photograph. She refused to write anything or sign the photographic array. He said Mr. Morton identified the Defendant on September 14, 2016, by choosing his photograph from a photographic lineup he showed him during their meeting at the police department. Unlike Ms. Beasley, Mr. Morton hand-wrote his identification and signed the photographic array.

On October 3, 2016, officers detained the Defendant at his home, located a few blocks from the crime scene. Detective Truitt testified that he took possession of the Defendant's cell phone, obtained a search warrant, and submitted the phone to the Metro Nashville Police Department's Surveillance and Investigative Support Unit ("SISU") for analysis. He identified photographs and a "rap video" of the Defendant that had been extracted from the cell phone, which showed the Defendant wearing similar clothing and jewelry as the suspect in the security camera footage. He said the Defendant was eventually arrested for the murder of the victim on April 1, 2017. A single .40-caliber shell casing was found at the crime scene but the murder weapon was never recovered.

On cross-examination, Detective Truitt acknowledged that the video of the Defendant walking in the alley was recorded at a much closer camera angle than the video of the suspect who ran up behind the victim. He further acknowledged that the enlarged frames that showed the suspect's clothing and jewelry were taken from the footage of the Defendant walking in the alley ten minutes prior to the shooting. He conceded there did not appear to be anything hanging from the Defendant's back pocket when the Defendant was walking in the alley, whereas there was a white spot visible on the rear pocket of the suspect who was recorded running after the victim. Finally, he acknowledged that no communications between the Defendant and the victim were found on the Defendant's phone and that he never submitted the victim's phone for analysis.

On redirect examination, Detective Truitt agreed that the white spot visible on the back of the suspect's shorts could have been caused by the rear pocket's being turned inside out, exposing the white lining, when the suspect pulled a gun from the pocket.

Metro Nashville Police Department Detective Andrew Davis testified that he sent still photographs from the surveillance videotape to Detective Gary Shannon, who was familiar with many of the individuals who lived in the area. Based on information he received from Detective Shannon, he searched for the Defendant's Facebook page via the Defendant's phone number and found an account under the profile name "CTN Varis" that contained photographs of the Defendant. He identified photographs of the Defendant pulled from the Facebook page that showed the Defendant wearing what appeared to be the same clothing and jewelry as the shooting suspect. The photographs were dated August 31, September 2, and September 3, 2016.

Dorothy Nelson testified that on September 4, 2016, she was living in the Cheatham Place Apartment complex in an apartment that overlooked Delta Avenue. She said she was familiar with the Defendant, who frequented the neighborhood, by his nickname, "World." She was also familiar with the victim. At approximately 3:30 p.m. on the day of the shooting, she saw the Defendant, who was dressed in a black t-shirt, sitting on a ledge or wall outside her apartment. At approximately 5:30 p.m., she saw the Defendant and the victim sitting together on the same wall, which was approximately fifteen to twenty feet from her. She said there were other people congregated in the area as well and described the scene as "[j]ust a bunch of people over there drinking and talking and being loud." She testified that she did not hear a gunshot, but she later went outside and saw the victim's body lying in the street. On September 7, 2016, she met with Detective Truitt at the police station and identified the Defendant from a photographic array as the man she had seen talking with the victim. She also made a positive courtroom identification of the Defendant as the man she saw with the victim that afternoon.

On cross-examination, she testified that the wall where she saw the victim and the Defendant was the spot where individuals regularly gathered to drink, including the victim, whom she saw almost every day. She estimated that on the afternoon of the shooting there were approximately eight to ten individuals in the area.

Detective Gary Shannon of the Springfield Police Department testified that at the time of the shooting, he was employed as a detective with the Metro Nashville Police Department assigned to north precinct investigations and was familiar with the individuals who frequented the area around the Cheatham Place Apartments. On September 6, 2016, Detective Andrew Davis sent him two photographs of the shooting suspect. Detective Shannon testified that he immediately recognized the suspect as the Defendant. He had seen the Defendant "[m]ore than once" and was "100 percent positive" in his identification. He stated that he searched the Defendant's publicly viewable photographs on the Defendant's Facebook page, which was under the profile name "CTN Varis," and retrieved a photograph of the Defendant holding a handgun with another individual who was also holding a handgun. He identified the photograph, which was dated August 14, without a year listed. He agreed that it is a common Facebook practice not to have a year listed if the item has been posted during the current year. He made a positive courtroom identification of the Defendant.

Courtney Bouchie, a crime scene investigator with the Metro Nashville Police Department and the lead crime scene investigator assigned to the case, identified diagrams of the crime scene and photographs of evidence collected in the case. She testified that a single .40-caliber cartridge casing was in the street but no bullets or weapons were found. While she was still on the scene that night, an officer brought her the victim's belongings from the hospital. Among the items inside the plastic hospital bag was the victim's clothing, watch, cell phone, wallet, and $15.55 in cash. On cross-examination, she estimated that the distance from the surveillance camera that overlooked the street to the victim's body was approximately 100 feet.

Dr. Thomas Deering, the medical examiner who performed the autopsy of the victim's body, testified that the cause of death was a single gunshot wound to the back and the manner of death was homicide. On cross-examination, he testified that he did not make any assessment of the caliber of bullet that struck the victim.

Videotaped deposition testimony was played of a crime laboratory technician who identified the gun the Defendant was holding in the Facebook photograph as one that appeared capable of firing a .40-caliber bullet.

Metro Nashville Police Department Detective Chad Gish of the SISU unit, an expert in digital forensics, described his extraction and analysis of data from the Defendant's cell

phone and identified chat messages he found on the phone that the Defendant, via the "CTN Varis" profile name, had exchanged on Facebook messenger with a "Cory Wilson" on the day after the shooting. Those included a message in which the Defendant stated that "ugly sh**" was "piling up on [him]" based on something that had happened the previous day.

Detective Gish also identified a "rap video" found on the phone that was filmed on September 18, 2016. After the State introduced the parties' stipulated agreement that the video had been redacted to exclude irrelevant material, the video of the Defendant performing the rap song was played for the jury and admitted into evidence. Among the Defendant's lyrics were ones about having "up it on him bust it on him," and having "caught a body 'bout three weeks ago" and not "giv[ing] a f***[.]"

On cross-examination, Detective Gish acknowledged that he found no phone calls, texts, Facebook messages, or any other communications between the Defendant and the victim.

Dr. Jeffrey Neuschatz, a cognitive psychologist who was accepted by the court as an expert in the field of eyewitness identification, testified on the Defendant's behalf that high stress situations, limited "exposure time," and the use of alcohol or drugs were all factors that impair an individual's ability to make an accurate identification. He further testified that the lineup procedure that the detective employed with Ms. Beasley did not follow all the guidelines established by the United States Attorney General's Office in 1999 because it was not conducted by an individual who was "blind to the suspect" or unaware of the suspect's identity, and, to his knowledge, Ms. Beasley did not issue a "confidence statement" about her identification of the Defendant at the conclusion of the lineup.

On cross-examination, Dr. Neuschatz acknowledged that Ms. Beasley told the detective during her interview that she was frightened and that her friends had admonished her not to identify the Defendant. He further acknowledged that a witness's familiarity with a subject increases the likelihood of an accurate identification.

The Defendant elected not to testify and rested his case without presenting any further witnesses. Following deliberations, the jury found him guilty of first degree premeditated murder as charged in count one, guilty of the lesser included offense of second degree murder in count two, and not guilty in count three.

## ANALYSIS

The Defendant argues on appeal that the evidence was not sufficient to establish his identity as the perpetrator of the crime. In support, he points out, among other things, that

none of the three eyewitnesses who placed him in the company of the victim knew him well enough to know his real name, there was no surveillance footage of the shooting itself, and the video of the man who ran up behind the victim was filmed from a distance, with the suspect not clearly visible. The State argues that the evidence, which included eyewitness testimony of the shooting itself, was more than sufficient for the jury to find that the Defendant was the man who shot and killed the victim. We agree with the State.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Viewed in the light most favorable to the State, the evidence was sufficient to establish the Defendant's identity as the man who shot and killed the victim. The identity of the perpetrator "is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). A perpetrator's identity "may be established solely on the basis of circumstantial evidence." State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010). In this case, there was not just circumstantial evidence but direct eyewitness testimony by Ms. Destiny identifying the Defendant as the man she saw shoot the victim in the back. Mr. Morton, who did not witness the actual shooting, testified that he saw the victim and the Defendant talking just before he heard the gunshot and that he saw the Defendant fleeing with a gun immediately after the shooting. Ms. Nelson also offered eyewitness testimony that the Defendant, who was wearing a black t-shirt similar to the suspect in the surveillance video,

was congregated with the victim and others in the area shortly before the victim was shot. All three of these witnesses testified that they were familiar with the Defendant from his regular appearances in the neighborhood. The fact that they did not know his real name does not lessen their ability to recognize him.

In addition to the eyewitness testimony, the State provided surveillance footage of the seconds before and after the shooting, which showed a man running up behind the victim and then picking up something from the street near the victim's fallen body. A police detective familiar with the Defendant identified that man as the Defendant, and surveillance footage of the Defendant in the area ten minutes earlier showed that he was wearing similar clothing as the suspect. Finally, the State also presented images, chats, and videos pulled from the Defendant's Facebook page that showed him holding a gun that appeared capable of firing a .40-caliber bullet, wearing similar clothing, and expressing what could be interpreted as consciousness of guilt. From all this evidence, a rational jury could reasonably find that it was the Defendant who shot and killed the victim. We conclude, therefore, that the evidence is sufficient to sustain the Defendant's conviction.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE